**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael W Douglass, | No. CV-24-00928-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| HonorHealth, et al., | |
| Defendants. | |

Pending before the Court is Defendants HonorHealth's, Todd Laporte's, and David Price's (collectively "Defendants") Motion to Dismiss, which is fully briefed. (Docs. 7, 8, 9.) For the following reasons, Defendant's Motion will be granted in part.[1]

**I.    BACKGROUND**

In March 2022, Plaintiff Michael Douglass and his fiancé were visiting Phoenix for a brief vacation. (Doc. 1-1 ¶ 10.) On March 2, the two got into an argument and Douglass ingested several blood pressure medication tablets. (*Id.* ¶ 11.) After doing so, Douglass requested his fiancé call 911, and he was taken by city ambulance to the emergency department of HonorHealth Deer Valley Medical Center. (*Id.* ¶ 12.)

After being admitted to the hospital, Douglass was not allowed visitation or the use of a telephone, and his personal items were locked away. (*Id.* ¶ 14.) Hospital staff informed Douglass and his fiancé that he would need to receive psychological clearance from a County medical employee before being released. (*Id.* ¶ 16.) Douglass requested release but

---

[1] McKenna Hunter, a third-year law student at the Sandra Day O'Connor College of Law at Arizona State University, assisted in drafting this Order.

was forcibly removed to an undisclosed location in the hospital by security. (*Id.* ¶¶ 17–18.) Douglass alleges that three Phoenix police officers were present in the hallway prior to his transfer but does not allege that the officers played any role in his transfer. (*Id.*) Upon discovering his room number, his fiancé visited during visiting hours, but security ordered her to leave. (*Id.* ¶¶ 18–19.) Despite Douglass being coherent and calm, and his repeated requests to leave, he was not permitted to leave against medical advice. (*Id.* ¶¶ 14, 20.)

On March 4, Douglass began bleeding while urinating and became fearful of intense pain based on his history of kidney stones; a nurse on duty administered him Ativan, a psychotropic drug, intravenously to help with the pain. (*Id.* ¶ 21.) Douglass became confused, disoriented, and agitated because of an adverse reaction to the Ativan, but was diagnosed with delirium tremens, a form of alcohol withdrawal. (*Id.* ¶¶ 22–23.)

On March 5, Douglass remained alarmed, incoherent, and confused as an alleged result of hourly Ativan injections, recounting at one point to his fiancé that he had eight security personnel in his room. (*Id.* ¶¶ 25–26.) In the afternoon, hospital staff informed Douglass's fiancé that he needed a psychological evaluation and, when she questioned the utility, was escorted out of the building for allegedly trespassing by both hospital security and off-duty Phoenix police. (*Id.* ¶ 27.) Later that afternoon, Douglass was physically restrained and injected with Depakote, which caused an allergic reaction requiring that he be intubated in the ICU. (*Id.* ¶¶ 28–29.)

On March 11, a week later, Douglass was removed from the ventilator but remained physically restrained and continued to receive Ativan injections for two weeks resulting in a continuing state of confusion, hallucination and akathisia, often not understanding why he was in a hospital. (*Id.* ¶¶ 30–31.) Around March 14, Douglass's fiancé obtained counsel who filed a habeas petition, and received a scheduled hearing date of March 23. (*Id.* ¶ 32.) On the morning of March 23, Douglass was transferred to Phoenix Medical, and the hearing was cancelled as moot. (*Id.* ¶ 33) On March 24, Douglass voluntarily signed out of Phoenix Medical; his health insurance was later billed $285,000 for services rendered, but payment was denied. (*Id.* ¶¶ 35–36.)

On March 6, 2024, Douglass filed a complaint against Defendants in Arizona state court. (Doc. 1 ¶ 1.) Douglass alleged seven counts against Defendants: (1) state statutory violations; (2) negligence per se; (3) intentional infliction of emotional distress; (4) medical negligence; and (5–7) three 42 U.S.C. § 1983 claims for violation of Douglass's Eighth, Fourteenth, and Fourth Amendment rights respectively. (Doc. 1-1 ¶¶ 37–106.) After Defendant LaPorte was served with the Complaint on April 3, Defendants HonorHealth and Price waived service and Defendants filed a notice of removal on April 23. (Doc. 1 ¶ 2.) Defendants predicated the Courts jurisdiction on the three § 1983 claims under 28 U.S.C. § 1331 and the four remaining state law claims under 28 U.S.C. § 1367. (Doc. 1 ¶¶ 3–4.)

## II.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A court may dismiss a complaint "if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (internal quotations and citation omitted). A complaint must assert sufficient factual allegations that, when taken as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is more than mere possibility; a plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When analyzing the sufficiency of a complaint, the well-pled factual allegations are taken as true and construed in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

## III.  ANALYSIS

Defendants move to dismiss all claims now on limitations grounds and pleading deficiencies under Federal Rule of Civil Procedure 12(b)(6). (Doc. 7 at 4–10.) Defendants LaPorte and Price move separately for dismissal for failure to allege any direct actions or

omissions in the Complaint under 12(b)(6). (*Id.* at 10.) In the alternative, Defendants move to dismiss all claims other than medical malpractice. (*Id.* at 10–12.) Because the Court's jurisdiction is predicated on the § 1983 claims, the Court turns first to that analysis.

### A.      42 U.S.C. § 1983 Claims

Section 1983 claims support a claim for a federal constitutional violation "only when the alleged injury is caused by 'state action' and not by a merely private actor." *Jensen v. Lane Cnty.*, 222 F.3d 570, 574 (9th Cir. 2000). As a result, a valid § 1983 claim requires that a plaintiff sufficiently allege that (1) Defendants deprived him of a constitutionally secured right and (2) in doing so Defendants acted under "color of state law." *Id.* Defendants contend that Douglass failed to allege facts showing Defendants acted under color of law. (Doc. 7 at 6–8.) In the Complaint, Douglass asserts four reasons why Defendants should be deemed state actors for purposes of § 1983: (1) Defendants relied on state law as its authority to detain Douglass; (2) Defendants contracted off-duty Phoenix police officers who were armed and fully uniformed as security for enforcement; (3) a Phoenix ambulance delivered Douglass to the hospital; and (4) Defendants claimed Douglass needed a psychological evaluation conducted by a County official before he was able to leave. (Doc. 1-1 ¶ 90.)

Because § 1983 claims exclude "merely private conduct, no matter how discriminatory or wrong," determining whether a private party acted under color of state law begins with the "presumption that private conduct does not constitute governmental action." *Sutton v. Providence St. Joseph Med. Center*, 192 F.3d 826, 835 (9th Cir. 1999). Courts have used four different tests to identify what constitutes acting under color of law: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. *Sutton*, 192 F.3d at 835–36.[2] Satisfying any of the four tests—as

---

[2] Because the analysis is quite fact-intensive, courts have sometimes diverted from the "tests" listed and instead look at other factors. *See Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751–56 (9th Cir. 2020) (looking at six factors to determine color of law); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (listing seven different approaches to determine state action). More frequently though, courts use one or multiple of the four tests listed above. *See, e.g.*, *O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023).

long as there are no countervailing factors—is sufficient. *See Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).

Defendants cite to *Hood v. Cnty of King*, 743 Fed. App'x 79 (9th Cir. 2018), as well as *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), and *Jensen* to assert that the decision to involuntarily commit a patient can "*only* be considered state act[ion] when the State is so involved in the process as to override the providers' independent actions." (Doc. 7 at 7) (emphasis added). The Court disagrees with Defendants' reading of these cases. While a court can certainly consider whether state law overrode a private providers medical judgment as evidence of state action, the exercise of independent medical judgment is not dispositive. *Rawson*, 975 F.3d at 750–51. Rather, the appropriate course of action is to engage in a fact-intensive inquiry to determine whether there are sufficient reasons to find state action. *See id.* The Court thus assess the facts as alleged for each of the four tests in turn.

### 1. Public Function

The public function test is satisfied when it is shown that "the function at issue is 'both traditionally and exclusively governmental.'" *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003) (citation omitted). Nothing in the Complaint directly asserts that a hospital committing a patient is a role that is either traditionally or exclusively governmental. Furthermore, countless courts have previously assessed the involuntary commitment of a patient by a private hospital and have consistently determined that the public function test is inapt. *See Jensen*, 222 F.3d at 574–75 ("Because our case combines private actors and government officials, it does not fall within the rule of the cases concerning private actors who perform a 'public function.'"); *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 258–60 (1st Cir. 1994) (finding that the history of involuntary commitment dating back to the Colonial era supports the conclusion that the commitment of patients is not an "*exclusive* prerogative of the state") (emphasis in original); *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992) (finding that co-extensive powers with the state to be irrelevant in the analysis, and determining that involuntary commitment does not establish state action). The Court agrees

with this analysis and finds that the public function test cannot be efficiently established.

### 2.  Joint Action[3]

A showing of joint action is established "either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *O'Handley v. Weber*, 62 F.4th 1145, 1159 (9th Cir. 2023) (quotations and citation omitted). For purposes of the state action doctrine, the joint action test is met when the State "significantly involves itself in the private parties' actions and decision making" through a "complex and deeply intertwined process." *Rawson*, 975 F.3d at 753. Courts have found joint action for example when city police trained private guards and authorized them to issue citations with lawful force. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012).

Douglass heavily relies on *Rawson* where the court found that joint action was shown for an involuntary commitment of a patient. 975 F.3d at 754. But the facts in *Rawson* demonstrate a public-private dynamic that is significantly more entangled. In *Rawson*, a county prosecutor played "an outsized role in the duration of [plaintiff's detention]" and the initial commitment followed an arrest by police. *Id.* at 745, 754. Likewise in *Jensen*, the court found state action when the commitment was initiated by county employees and relied heavily on police reports and information from a county mental health specialist. 222 F.3d at 575–76.

The facts here do not rise to the same level of "complex and deeply intertwined" actions between the state and Defendants relating to Defendants' decision making. Firstly, nothing in the Complaint nor Douglass's response asserts that HonorHealth was conspiring with state actors. Furthermore, Defendants' decision-making process is easily distinguishable from cases where courts found state action. Unlike both *Rawson* and *Jensen* where the action was initiated by state actors, Douglass voluntarily began the process when his fiancé called 911. (*See* Doc. 1-1 ¶ 12.) Additionally, there are no well-pleaded

---

[3] Some courts combine the joint action and governmental nexus tests into one test. *See Jensen*, 222 F.3d at 574; *Doe v. Rosenberg*, 996 F. Supp. 343, 352 (S.D.N.Y. 1998); *but see O'Handley*, 62 F.4th at 1157–59. Because the two tests ask distinct questions, the Court declines to analyze them together. *See O'Handley*, 62 F.4th at 1157–59.

allegations that any communications between HonorHealth and state or county officials occurred relating to his commitment. While Douglass does assert that the initial commitment was to await a psychological assessment from a county official, he nowhere alleges that any such interaction occurred. (*Id.* ¶ 90.) *See Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 504 (9th Cir. 1996) (finding that a task force being involved with an investigation but not involved in the final decision was insufficient to support state action). Collectively, nothing in the Complaint plausibly establishes that there is a situation where the "state has so far insinuated itself into a position of interdependence with the private party that it must be recognized as a joint participant." *Tsao*, 698 F.3d at 1140 (cleaned up). As a result, the Complaint also fails this test.

### 3. Governmental Compulsion or Coercion

The government compulsion/coercion test considers "whether the coercive influence or 'significant encouragement' of the state effectively converts a private action into a government action." *Kirtley*, 326 F.3d at 1094 (citation omitted). In cases against private defendants, courts are divided, but the Ninth Circuit has found that the test requires more than "the mere fact that the government compelled a result." *Sutton*, 192 F.3d at 838. Rather, it requires instances akin to private parties being "left with no choice of [their] own." *Id.* (quotations and citation omitted). Nothing in the Complaint asserts that Defendants were compelled without a choice to act in the way alleged. To the extent the Complaint asserts Defendants acted because of Title 36 mandates, this alone is insufficient, as it does not rise to the level of coercion that mandates a private party's action. *Id.* at 841 (finding that governmental compulsion is insufficiently established by showing merely that a private party followed generally applicable law); *see O'Handley*, 62 F.4th at 1157. Thus, Douglass's allegations fail to meet the government compulsion test.

### 4. Governmental Nexus

The final test—the nexus test—looks to whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,

531 US. 288, 295 (2001) (quotations and citation omitted). The Ninth Circuit has recognized that there are two versions of the test: (1) a less common version asking whether there is "pervasive entwinement" between public institutions or officials and the private actor's functioning; and (2) a version when the government's encouragement is so significant, the private party's choice should be attributed to the State.[4] *O'Handley*, 62 F.4th at 1157–58. The Complaint does not plausibly allege that either version of the test is met.

In looking at the first version, courts consider factors such as whether the organization is composed of state institutions, public officials dominate decision making, the organization is state funded, or the organization is acting "in lieu" of a traditional state actor. *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008). There are no allegations in the Complaint to support that Defendants are pervasively entwined with the State. As the Court found under the Joint Action analysis, the allegations do not support public officials dominating Defendants' decision making. Moreso, nothing in the complaint asserts that HonorHealth uses public land or receives public funds as was the case in both *Rawson* and *Jensen*. *Rawson*, 975 F.3d at 756; *Jensen*, 222 F.3d 573.

Likewise, in looking at the second version, nothing supports government encouragement being so significant to attribute Defendants' actions to the State. Courts have found this to be the case when there are "positive incentives" from the government that can "overwhelm . . . and essentially compel [a private] party to act in a certain way." *O'Handley*, 62 F.4th at 1158. Because the facts alleged here do not plausibly provide a significant nexus, the Complaint fails to establish that Defendants are state actors under the nexus test.

### 5. Summary

In reviewing all four tests, Douglass fails to allege sufficient well-pleaded facts to attribute Defendants as state actors for purposes of § 1983. Defendants also contend that

---

[4] In *O'Handley* the Ninth Circuit also recognized that the second nexus test can also be used in conjunction with the government compulsion or coercion test. 62 F.4th 1157. Because the Court already determined that the Complaint does not meet the compulsion test, it does not need to re-examine the question of government compulsion.

1 the § 1983 claim is barred by statute of limitations; the Court need not address this issue given the allegations do not plausibly allege state action. Given that supplemental jurisdiction was predicated on the three § 1983 claims, if those claims are dismissed, the Court could under 28 U.S.C. § 1367(c) decline jurisdiction and remand the case back to the state. As a result, the Court declines to analyze other arguments made by the parties.

### B. Leave to Amend

Douglass requests leave to amend the Complaint as it relates here "to provide additional facts regarding governmental involvement." (Doc. 8 at 8.) Ordinarily, dismissal without leave to amend is improper unless any amendment would clearly be futile. *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011). Because of both Rule 15, Fed. R. Civ. P., policy favors amendments and the leniency allotted to pro se litigants, the Court will provide Douglass with an opportunity to amend. *See Ascon Props., Inc. V. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989); *see Haines v. Kerner*, 404 U.S. 519, 520 (1972). If Douglass is unable to amend the Complaint to plausibly allege that Defendants were acting under color of law, the Court will likely dismiss the three § 1983 claims and remand the cause of action to the State Court.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** granting Defendants' Motion to Dismiss (Doc. 7) in part as it relates to the three 42 U.S.C. § 1983 claims (Counts 5, 6, and 7) with leave to amend. The other arguments presented in Defendants' Motion are denied without prejudice to refiling.

**IT IS FURTHER ORDERED** that Plaintiff Michael Douglass may file an amended complaint no later than 30 days from the date of this Order.

. . . .

. . . .

. . . .

. . . .

. . . .

**IT IS FURTHER ORDERED** that if no amended complaint is filed within 30 days from the date of this Order, the Clerk of Court shall, without further notice, enter judgment of dismissal on Counts 5, 6, and 7 and remand the remaining counts to the Superior Court of the State of Arizona, Maricopa County.

Dated this 11th day of October, 2024.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge